302 So.2d 517

**AIR MOVERS OF AMERICA, INC., a corp., et al.**

v.

**STATE NATIONAL BANK OF ALABAMA, a National Banking Ass'n, etc.**

**SC 244.**

Supreme Court of Alabama.

Oct. 3, 1974.

See also, 293 Ala. 308, 302 So.2d 513.

Bell, Richardson, Cleary, McLain & Tucker, Stapp & Spencer, and James H. Porter, Huntsville, for appellants.

Lanier, Shaver & Herring and John M. Heacock, Jr., Huntsville, for appellee.

COLEMAN, Justice.

Certain of the respondents appeal from the final decree rendered by the circuit court, in equity, in an interpleader suit.

Complainant is State National Bank of Alabama, a national banking association having places of business in Huntsville. Complainant will sometimes be referred to as the Bank.

The respondents are two corporations and twelve natural persons. One corporate respondent is Air Movers of America, Inc., an Alabama corporation, having its principal place of business in Huntsville. Air Movers will sometimes be referred to as Air Movers or as the corporation. Prior to the filing of the bill of interpleader, the corporation maintained a checking account with the Bank.

The other respondent corporation is International Van Lines, Inc., having its principal place of business in Huntsville.

The twelve respondents, who are natural persons, are separated into two groups by reason of their opposing claims with respect to control of the corporation and the right to the money in the corporation's checking account.

Respondents Webb, Thomas, Mash, Nevels, Youngblood, and Morris are one of the groups. At some time they were, or allegedly were, directors of the corporation. They may be referred to hereinafter as the Mash group.

Thomas testified that he, at one time, filed a suit for "them" and agreed to represent "them as attorney for the corporation." He testified further he did instruct Mash that he, Thomas, did not wish to be a director of the corporation; that he never attended any meeting of the corporation; and that he withdrew as attorney for the corporation and for Mash. The final decree recites that Thomas has filed a written disclaimer to the funds on deposit in this cause.

At some time or times, four members of the Mash group were, or allegedly were, officers of the corporation, respectively, as follows: Mash, President; Youngblood, Vice President; Webb, Secretary-Treasurer, and Nevels, Assistant-Secretary.

The other six natural persons, who are respondents, are appellants Hill, Stapp, Gaskin, Pollak, Osburn, and Hembree, all of whom were, or allegedly were, at some time or times directors or officers of the corporation.

At pages 773 and 774 of the transcript, the minutes of a joint meeting of stockholders and directors of the corporation state that appellants Hill, Stapp, Pollak, Osburn, and Hembree, and also respondents Mash and Webb, were stockholders. It may be that other respondents also were stockholders.

The corporation was organized October 1, 1968, by filing articles of incorporation in the office of the Judge of the Probate Court in Huntsville. The objects for which the corporation was formed are stated to be to pack, move, ship, and forward packages, merchandise, furniture, and any and all commodities, for hire, and to carry on any and all lawful business in connection therewith. The objects of the corporation are described in further detail on three transcript pages.

The three incorporators were also shown to be officers and directors of the corporation, to wit: Mash, President; Hill, Vice President; and Hembree, Secretary-Treasurer.

Capital stock is stated to be 800,000 shares of common stock of the par value of ten cents per share. Mash subscribed for 398,000 shares, and Hill and Hembree each subscribed for 1,000 shares. Respondents' Exhibit 20 appears to be the original of a stock certificate, dated October 1, 1968, certifying that Mash is the owner of 398,000 shares of the capital stock of Air Movers of America, Inc. The certificate is signed by Mash, President, and Hembree, Secretary-Treasurer. On the back of the certificate is the transfer form which is signed "Clyde Mash." The

blanks in the transfer form are not filled in and the form bears no date.

It appears that the corporation proceeded to carry on its business with profitable results. Respondents' Exhibit 12 contains an operating statement for the period October 1, 1968—November 30, 1968, which shows sales amounting to $16,387.85, and net income after taxes of $2,328.84.

The record indicates that additional people bought stock. The operators and stockholders decided to "go public" and take steps necessary to qualify and register so that the capital stock of the corporation could be sold to the general public.

The record indicates that Mash was sole owner of respondent International Van Lines, Inc., and that he had paid, or agreed to pay, for some part or all of his stock in Air Movers by conveying to Air Movers certain equipment and vehicles owned by International Van Lines. The valuation of the equipment and vehicles conveyed or to be conveyed is not clear.

The payment, or proposed payment, for stock by Mash, by conveying the equipment and vehicles, presented a problem in qualifying Air Movers to "go public." It appears that a proposal was made whereby Air Movers would lend Mash enough money to pay cash for his stock in lieu of the equipment and vehicles of International Van Lines. It further appears that the proposed loan by Air Movers also presented a problem in the process of qualifying Air Movers to go public. The details of the various proposals are not entirely clear.

In any event, it appears that the operators of Air Movers were making an effort to "go public" and employed an underwriter to accomplish that objective.

Certain exhibits are in evidence which are pertinent to the purpose of the corporation in the matter of going public and are also pertinent to the specific occurrences which preceded the filing of the bill of interpleader by the Bank. Some of these exhibits are copies, or alleged copies, of minutes of meetings of stockholders and directors of the corporation, bank account signature cards, and resolutions adopted at the meetings referred to.

Exhibit 1 (Tr. 247), attached to the deposition of Mash, is a copy of the minutes of a specially called joint meeting of stockholders and directors of the corporation on February 26, 1969, in Huntsville. The minutes recite that Mash, president of the corporation, requested that Stapp preside. Stockholders present and absent, and the number of shares owned by each, are listed. The list shows Mash as owning 74,000 shares. The minutes recite that: "Mr. Stapp announced that the primary purpose of the meeting was to authorize a loan from the corporation to Mr. Clyde Mash in the amount of $90,000 . . ." approved by the underwriter, " . . . to permit Mr. Mash to subscribe to the additional shares of capital stock previously contemplated in exchange for the transfer of certain equipment . . ." from Mash to the corporation. Stapp pointed out that the transfer of assets in exchange for the capital stock appeared to raise numerous problems with respect to registration of stock with the Securities and Exchange Commission. Upon motion unanimously adopted, the $90,000.00 loan to Mash was approved, to be secured by mortgage on the entire 74,000 shares belonging to Mash. Other matters were considered.

Attached to the minutes is a waiver of notice and ratification of the acts at the joint meeting on February 26, 1969. The waiver is dated March 12, 1969, and bears the purported signatures of Mash and seven other persons.

In his deposition, Mash testified that the minutes are not correct as showing that he owned only 74,000 shares; that no one ever saw the minutes of the corporation; that minutes most of the time were taken by Stapp and Hembree; that for months meetings were held, they were never drawn up; that additional minutes have been drawn up and he never saw them; that meetings were just called and not held at any regular time; there are additional

minutes he has never seen which he cannot verify; that he can verify the waiver of notice " . . . which at each meeting we sign those." He testified that he owned 398,000 shares; that reorganization was going to take place, and until it did he owned 398,000 shares, but " . . . nothing was ever consummated in the corporation."

Complainant's Exhibit 12 (Tr. 686) is purportedly a copy of the minutes of a specially called meeting of the board of directors on March 12, 1969. The minutes recite, among other things, that at the request of Mash, president of corporation, Stapp, attorney for corporation, presided; that Hembree, secretary-treasurer, read "the minutes of the last meeting," (no date), which were approved by unanimous vote; and that Stapp pointed out that at a called meeting on February 26, 1969, the corporation had been authorized to extend a loan to Mash " . . . to enable him to complete the acquisition of his capital stock in the corporation."

Complainant's Exhibit 8 (Tr. 679) purports to be a copy of the minutes of a meeting of the Board of Directors of the corporation on April 22, 1969. Mash made motion to dispense with reading of minutes "of the previous meeting," and motion was unanimously passed. Mash stated that he had talked with attorneys in New York and Washington and was of opinion that " . . . we can purchase outright, Air World Forwarders" as soon as "we" have divested ourselves of all interlocking holdings and stocks in other transportation companies and air lines. Stapp disagreed, read from F.A.A.Code, and stated he will file petition to C.A.B. for authority to purchase Air World Forwarders.

Stapp stated " . . . we need to clarify who are the beneficial owners of" the corporation before we can go ahead with our S.E.C. filing. Stapp offered a resolution which provided that the Board of Directors appoint a three-man committee composed of Dr. Patel, Osburn, and Hembree to review the activities of the president, Mash, who is directed to cooperate with the committee; that Mash is prohibited from entering into contracts with promoters or others in the name of the corporation without prior approval of the Board; that all mail directed to the corporation or its officers in their corporate capacity shall be reviewed and routed by Hembree; that if Herzfeld & Stern shall agree to consider further the handling of proposed underwriting of a public stock offering, the corporation shall undertake to negotiate the proposal to sell to Mash a five-year warrant to purchase up to 10,000 shares of corporation stock by endeavoring to obtain a "wider and fairer" distribution of warrants. Other matters were in the resolution.

Mash read to the group the resignation of Stapp "which he had accepted."

After considerable discussion, the resolution was passed with two votes for, one vote against, and three not voting.

Hembree moved that two signatures be required on all checks drawn on the corporation's account with the Bank; " . . . either two of the following signatures to be required: Mr. Mash, Mr. Hill or Mr. Hembree." The motion was unanimously adopted.

Respondent's Exhibit 9 (Tr. 768) purports to be a copy of minutes of a meeting of the Board of Directors on May 5, 1969. Exhibit 9 recites that:

Mash called the meeting to order; Mash, Hill, Gaskin, Stapp, Hembree, Patel, and Osburn were present; Pollak was absent; underwriter Scott was asked about the underwriting;

Stapp stated that all directors who were in town met on May 4 and called Pollak and Gaskin; all agreed to make a proposal to Mash in the form of a settlement for releasing all claims by Mash pertaining to the corporation and a settlement of all disputes between the corporation and Mash;

The proposal made to Mash was: $5,000.00 in cash now upon his signing the

release; $25,000.00 in cash when registration statement is filed; after successful completion of public offering, Mash would receive another $20,000.00 in cash or that amount in stock at $1.50 per share; 2,000 warrants to be exercised after the successful public offering;

Mash rejected this offer but said he was willing to negotiate; other matters were discussed;

Stapp pointed out that recently Mash tried to get Roberson to sign a blank check on the corporation's checking account with Mash, and Roberson rightfully refused to do so; Stapp said Mash then asked Gaskin to cosign a check with him in the amount of $19,500.00 and Gaskin rightfully refused; Stapp said Mash had told him that he intended to put the money in a savings account so he would have something to try to get Patel to work out something in Mash's favor on the money Patel gave him for purchase of stock;

Stapp stated he had spent sixty hours of work on corporation's business since April 1, and most of the sixty hours was spent uselessly because Mash would not take advice of counsel to try to do those things that were holding up registration;

The Board of Directors asked Mash a second time to reconsider and accept our offer but Mash refused;

The Board made Mash one last offer which added to first offer $2,500.00 in cash at time of registration and 3,000 more warrants and added one-year clause of no competition;

Mash agreed to accept the last offer and would finalize agreement by May 7, 1969;

Mash stated that he was resigning from the offices of President, Chairman of the Board, and director of the corporation; Osburn moved "that we accept this resignation" and motion was unanimously carried;

Gaskin made motion that "we remove Clyde Mash's name from all checking accounts" of the corporation; that four people, to wit, Gaskin, Hill, Hembree, and Roberson, be authorized to sign checks, and that two of these four signatures be required on all checks; and the motion was passed unanimously;

Osburn was unanimously elected temporary Chairman of the Board, and Gaskin was unanimously elected President;

Motion by Stapp that directors void Mash's contract and terminate his employment and salary as of April 30, 1969, was unanimously carried;

Stapp moved that secretary call a joint meeting of stockholders and directors for purpose of considering: (1) all legal matters pertaining to Mash's resignation as President, (2) all matters of legal nature involving Mash and his connection with corporation, (3) removal of Mash as director, and (4) all matters pertaining to underwriting for corporation and all affairs of the corporation; the motion passed unanimously.

Respondent's Exhibit 5 (Tr. 825) is the bill of interpleader, to which are attached a number of exhibits. Exhibit 2 of the bill is a corporate resolution on a filled in printed form dated May 6, 1969, and certified and signed by Hembree as secretary of the corporation. He certified that the resolution is a true copy of a resolution adopted by the Board of Directors on May 5, 1969. The Bank is designated depository of the corporation. The resolution states that all checks drawn against the bank account of the corporation shall be signed by Gaskin, President; Hill, Vice President; Hembree, Secretary-Treasurer; Bill Roberson, Comptroller. The resolution recites "TWO SIGNATURES REQUIRED."

At this point it seems proper to note that, in his deposition, Mash testified he had been aware of the resolution of May 6, 1969, but that the taking of his deposition was the first time he had seen the resolution; that he was not present at a director's meeting on May 5, 1969, at which the

resolution was adopted; that he was a director at that time; that he was not notified of any meeting of directors on May 5; that he did not, on July 2, know that the resolution was in existence, but knew of its existence at a later time.

Complainant's Exhibit 9 (Tr. 683) is a letter dated April 14, 1969, from Stapp to Mash. In the letter, Stapp states that "We" are still unable to meet the requirements stated by C.A.B. for the following reasons. Two reasons are stated. In the statement of the second reason the following appears:

" . . . it will be necessary for you to surrender the 406,800 shares of the capital stock of the corporation which have been previously issued to you and to issue in lieu thereof 42,000 shares based upon the 50¢ per share arrangement authorized by the Board of Directors for the $21,000 which you have paid to the corporation." In the deposition of Mash, the following appears:

"Q Now, am I correct then, at the end of April, 1969, you submitted your resignation as President of Air Movers of America, Inc., and as Chairman of the Board of Air Movers, Inc., and Director of Air Movers of America, Inc., subject to the terms and agreement being worked out between you and the corporation as to the amount of stock which you owned in the corporation and money to which you would be entitled under your employment contract?

"A Yes, sir.

"Q O.K.

"Were negotiations on these matters going on during the months of May and June, 1969?

"A Yes, sir.

"Q O.K.

"Those negotiations were carried on between your attorney and attorneys for Air Movers?

"A Yes.

"Q O.K.

"A Until the attorney said that no agreement could be reached.

"Q O.K.

"Now, which attorney said that no agreement would be reached?

"A Counsellor Stapp."

Three other lawsuits, related in some way to the instant case, were filed in the Circuit Court of Madison County.

In Case No. 25355, a bill of complaint (Complainant's Exhibit 2, Tr. 654) was filed June 9, 1969, in the name of Air Movers praying that Mash and Webb be temporarily and permanently enjoined from making false and defamatory utterances and writings concerning complainant, from representing themselves as lawfully speaking in the name of the corporation, from attempting to carry on business in the name of the corporation, and from instituting false, malicious, and frivolous legal actions against complainant, its officers, directors, attorneys, and stockholders. A temporary injunction (Respondents' Exhibit 18) was issued July 3, 1969.

In an unnumbered case, apparently filed by the Bank against Mash, an attachment bond and affidavit appear in the record as Respondents' Exhibit 3 (Tr. 689). The bond was approved June 13, 1969, and the affidavit bears the same date. The affidavit is made by Robert W. Stephenson who says he is Assistant Cashier of the Bank and is authorized to make the affidavit; that Mash is indebted to the Bank in the sum of $2,000.00 which is due; that Mash is about to move out of the state and remove his property out of the state; and that defendant has property liable to satisfy his debts which he fraudulently withholds.

In Case No. 19407, on July 7, 1969, at 3:23 p. m., a complaint in an action at law, Complainant's Exhibit 7 (Tr. 673), was

filed by Air Movers against the Bank, Mash, Webb, and Thomas. In the complaint the plaintiff claims of the defendants $55,000.00 for money had and received and on account, and claims $2,555,000.00 as damages for that on July 2, 1969, the Bank negligently withdrew or permitted the withdrawal of $52,310.00 from the account of plaintiff with the Bank. Plaintiff alleges that as the proximate consequence of the withdrawal plaintiff is without money to operate its business and cannot go forward with its public stock offering and subscribers to stock of plaintiff have been caused to have their investment in plaintiff in sum of $170,000.00 placed in jeopardy.

In the instant case, No. 25474, on July 8, 1969, the Bank filed its bill of interpleader which is mentioned at the beginning of this opinion. Averments of the bill are in substance as follows.

Prior to the filing of the bill, Air Movers maintained checking account with Bank. On July 2, 1969, Mash and Webb presented to the Bank a corporate resolution dated July 2, 1969, copy of which is Exhibit 1 to the bill.

Exhibit 1 to the bill is on the same printed form as Exhibit 2 to the bill, which is dated May 6, 1969, and has been described hereinabove (See Respondents' Exhibit 5, Tr. 825). Exhibit 1 to the bill is dated July 2, 1969, and is signed by Webb as secretary of the corporation. He certifies that the resolution is a true copy of a resolution adopted by the Board of Directors on July 2, 1969. The Bank is designated depository of the corporation. The resolution states that all checks drawn against the bank account of the corporation shall be signed by Mash, Webb, and Youngblood. The resolution states that Mash is President, Youngblood is Vice President, and Webb is Secretary & Treasurer.

The bill avers that the resolution dated July 2, 1969, superseded the resolution on file with the Bank dated May 6, 1969, which is Exhibit 2 to the bill.

The bill avers that at the time Exhibit 1 to the bill was delivered to the Bank, Mash, Youngblood, and Webb presented also to the Bank a signature card signed by Mash as President, Youngblood as Vice President, and Webb as Treasurer of Air Movers. The signature card is made Exhibit 3 to the bill.

Mash and Webb also presented to the Bank a stockholders' resolution purportedly adopted at a stockholders' meeting on July 2, 1969, which resolution is made Exhibit 4 to the bill. Exhibit 4 removed Hill, Stapp, Gaskin, Pollak, Osburn, and Hembree as directors and Stapp as counsel for Air Movers, such removals to be effective immediately. Exhibit 4 states that Webb, Thomas, Mash, Nevels, Youngblood, and Morris were elected directors until the next annual election; that Mash remain as President and Chairman of the Board until the end of his employment contract; that the offices at Skycenter be closed and all records, books, and papers be brought to offices at 1122 Putnam Dr. N.W.; that bank accounts be changed from the complainant Bank to the Bank of Huntsville; that the signatures of Hill, Gaskin, Hembree, and Roberson be withdrawn from signing further drafts or checks for the corporation; that Mash and Webb be the only signatures to appear on drafts for the company; that Hill, Hembree, and Gaskin be removed as officers effective immediately; that new officers be elected, to wit: Mash as President and Chairman, Youngblood as Vice President, Webb as Secretary and Treasurer, and Nevels as Assistant Secretary; and ". . . that this resolution be accepted and passed by a majority of the votes of the stockholders of the corporation of Air Movers of America, Inc. at a special meeting, notice given by mail of at least seven days, as call (sic) for in the by-laws."

The bill avers that immediately following delivery of said resolution dated July 2, 1969, and said signature card, Mash and Webb presented a check drawn on the corporation's account payable to the corpora-

tion for $50,000.00 signed by Mash and Webb, and also a second check drawn on said account payable to International Van Lines, Inc., for $2,310.00 signed by Mash and Webb. Copies of the two checks are made Exhibits 5 and 6 to the bill.

The check payable to Air Movers was endorsed by Mash as President, and at his request the Bank issued its cashier's check dated July 2, 1969, payable to Air Movers in amount of $50,000.00. The check payable to International Van Lines, Inc. was endorsed "Air Movers of America, Inc. Clyde Mash, Pres. International Van Lines Inc. by Clyde Mash Stockholder," and a cashier's check dated July 2, 1969, payable to International Van Lines, Inc., in amount of $2,310.00 was issued by the Bank. Copies of the two cashier's checks are made Exhibits 7 and 8 to the bill.

The bill avers that in the late afternoon of July 2, 1969, Stapp, representing himself as general counsel of Air Movers, called the Bank's downtown office and talked with a vice president of the Bank. Stapp told the vice president that the resolution presented to the Bank dated July 2, 1969, was a " 'forgery' " in that it was an " 'improper' " resolution, and that neither Mash nor Webb had authority to withdraw funds from Air Movers' account. There was also delivered to the Bank a notice calling a joint meeting of stockholders and directors on July 2, 1969. The notice is dated June 23, 1969, is signed by Mash, and is made Exhibit 9 to the bill.

The bill avers that the Bank, acting through the vice president mentioned above, requested Mash to return the two cashier's checks to the Bank, that Mash complied with said request, that the checks were placed in a safe deposit box in the Bank's main office, and that a key to the box was delivered to Mash, which box could be opened only with such key and the Bank's master key.

The bill avers that on July 7, 1969, Stapp and Hembree presented a check drawn on Air Movers' account for $50,000.00 and re-quested a cashier's check be issued in that amount. At the same time, there was delivered to the Bank a letter dated July 7, 1969, signed by Stapp as general counsel for Air Movers, demanding immediate release of the funds on deposit with the Bank in the name of Air Movers, and threatening damage suits if the request was refused. There was also left with the Bank a copy of a temporary injunction in Case No. 25355, mentioned above, enjoining Mash and Webb from carrying on or attempting to carry on the business of Air Movers.

The bill avers that on July 7, 1969, Stapp was advised by counsel for the Bank that a bill of interpleader would be filed in order that the court could resolve the issue as to which of the individual respondents is entitled to cash or otherwise negotiate said cashier's checks. Stapp, subsequently on July 7, 1969, filed suit in Case No. 19407 hereinabove mentioned.

The Bank avers that it is and has been at all times willing and desirous of paying said two cashier's checks to the parties entitled thereto, that controversy has arisen between the respondents as to which respondents are authorized to draw on said account, that an injunction has issued in Case No. 25355 enjoining Mash and Webb from so doing; and that the Bank is in doubt as to which respondents are entitled to cash the cashier's checks.

There is now in said account of Air Movers a balance of $910.80.

The Bank brings its bill and tenders $910.80 and delivers to the court the two cashier's checks. The Bank prays that respondents be required to propound their respective claims, that the court determine the parties who are entitled to the checks, that the Bank be discharged from all liability to respondents and awarded attorneys' fees.

As above noted, the bill was filed July 8, 1969. The deposition of Osburn was taken March 21, 1971, and Exhibit 1 to his depo-

sition is an agreement dated April, 1970. By the terms of Exhibit 1, Mash releases all his claims against Air Movers, its officers, directors, successors, and assigns, and all his claims to the cashier's checks and funds sought to be interpleaded by the Bank. Air Movers releases all its claims against Mash and agrees to dismiss all suits against him. Neither party to the agreement admits any liability to the other party, and both parties expressly deny liability to the other party.

On April 10, 1972, final decree was rendered. The decree recites in substance that, it appearing to the satisfaction of the court that:

prior to July 2, 1969, a dispute over the stock ownership and control of the corporation existed between the two groups of the respondents which are described above in this opinion;

on June 9, 1969, the appellants filed a bill in Case No. 25355 seeking to enjoin Mash as stated above;

the Bank was not notified of said dispute until some time subsequent to issuance of the cashier's checks on July 2, 1969;

appellants did not obtain injunction against Mash in Case No. 25355 until July 3, 1969;

on July 2, 1969, Mash filed complaint at law in Case No. 19407 against Stapp for possession of certain corporate records of Air Movers, that certain of said corporate records, including the stock book, were seized by the sheriff at the request of Mash in Case No. 19407, and said records remained in possession of the sheriff several weeks thereafter;

the Bank was not at fault or involved in bringing on said controversy, and the Bank did not wrongfully involve respondents in said controversy;

the controversy originated prior to July 2, 1969, and continued until April, 1970, when mutual release and settlement was executed between said opposing groups,

and appellants, in accord with said release, are the proper parties presently representing and in control of Air Movers;

on July 2, 1969, Mash and Webb presented to the Bank the documents shown as Exhibits to the bill Numbers, 1, 3, 4, 9, and 10 above described; ". . . said documents were examined by bank personnel and appeared to them to be in order . . ."; Mash and Webb presented the two checks (Exhibits 5 and 6 to the bill) which were endorsed as alleged; that said two cashier's checks for $50,000.00 and $2,310.00 were thereupon issued by the Bank ". . . in good faith . . ." and given to Mash and Webb;

subsequent to issue of said cashier's checks, Stapp called the vice president of the Bank and told him that the resolution presented by Mash was improper and that Mash had no authority to withdraw funds of Air Movers;

on July 2, 1969, subsequent to receiving the call from Stapp, the Bank requested Mash to return both cashier's checks, and both checks were returned to the Bank on or about July 3, 1969, and were placed in a safe deposit box which could be opened only with a key in possession of Mash together with the master key of the Bank; said cashier's checks were placed in said box prior to the first demand by appellants on July 7, 1969, for the funds represented by the checks, which demand was made by letter dated July 7, 1969, by Stapp in which letter the Bank was threatened with a damage suit if the Bank did not release said funds to appellants;

on the morning of July 7, 1969, prior to said letter from Stapp, an attorney for complainant advised Stapp that the Bank intended to file a bill of interpleader to determine which of respondents were entitled to cash or negotiate said cashier's checks; on the afternoon of July 7, 1969, Stapp, purportedly on behalf of Air Movers instituted a suit at law against the Bank for failure to pay the money for which de-

mand had been made in said letter earlier on the same day;

complainant filed the bill of interpleader on the following day, July 8, 1969, and delivered said cashier's checks to the register at the time of filing the bill of interpleader, together with the amount of $910.80 remaining in said account, and the Bank did offer and was at all times ready to pay into court the funds in said account;

on May 25, 1970, pursuant to the court's order, the full amount of Air Movers' account was paid to the register and ". . . said funds have been drawing interest since that time";

the Bank was at all times a disinterested stakeholder; a hazard of double liability confronted the Bank on July 2, 1969, after it was contacted by Stapp and advised of appellants' claim to said funds; said hazard continued to confront the Bank thereafter; there is only one liability of the Bank for said funds and the bill presents a proper case for interpleader under Equity Rule 36;

the Bank has incurred a reasonable attorney's fee of $7,500.00 in this suit and is entitled to payment of said fee in said amount from the funds on deposit with the register.

In accord with said findings, the court decreed that a proper case of interpleader exists; the Bank was discharged from all liability, in tort and contract, to respondents growing out of the facts alleged in Case No. 19407; the Bank is awarded $7,500.00 for attorney's fee; appellants are enjoined from further prosecuting Case No. 19407; costs are taxed against Air Movers and are ordered to be paid by the register out of deposited funds; and the balance of said funds are to be paid by the register to attorneys of record herein for Air Movers for the use of Air Movers, subject, however, to any claims and liens on file in the register's office.

Application for rehearing was made, continued, and, with minor clerical corrections, overruled July 17, 1972.

Appeal was taken January 16, 1973.

Motion to affirm was denied, motion to dismiss was granted conditionally, and opinion on the motions was delivered by this court on August 30, 1973.

Application for rehearing of this court's ruling on said motions was granted September 27, 1973. On November 2, 1973, the appeal was submitted on briefs in lieu of oral argument which had been requested.

Appellants have assigned thirty-one errors. Argument in support of the assignments is divided into nine subdivisions. The argument in support of the first eight subdivisions assert that the court erred in certain findings or orders in the decree because the findings or orders complained of are not supported by the evidence.

1.

Appellants assert that the court erred in finding that prior to July 2, 1969, a dispute over the stock ownership and control of Air Movers existed between the two groups of respondents heretofore described.

█ Where a decree is rendered on evidence taken ore tenus, or partly so, and the trial court has the advantage of seeing and hearing the witnesses, this court will not disturb his conclusion unless it is plainly and palpably erroneous. Thompson v. Collier, 170 Ala. 469, 54 So. 493; Ala.Digest, Appeal and Error, 1009(3).

As stated above, in Case No. 25355, Air Movers, on June 9, 1969, filed suit against Mash and Webb praying for declaratory judgment and injunction against them. Stapp made affidavit that the averments of the bill are true and correct.

█ On this point, the evidence will not be repeated in detail. This court holds that the evidence herein set out with re-

spect to minutes of meetings of stockholders and directors, resolutions adopted or purportedly adopted, testimony of witnesses, and records of legal proceedings which had been initiated prior to July 2, 1969, is sufficient to support the finding that a dispute existed between the two groups of stockholders prior to July 2, 1969.

Appellants contend that the claims asserted by Mash were frivolous. The dispute between appellants and Mash or the Mash group was not settled by the court, but was settled by the agreement executed by Mash and Air Movers in April, 1970. The parties to the agreement were careful not to admit liability to the other party. The record does not persuade us that Mash's claim was frivolous.

### 2.

Appellants assert that the court erred in finding that the Bank was not notified of a dispute over the ownership and control of Air Movers until some time subsequent to the issue of the cashier's checks on July 2, 1969, in that said finding of fact is contrary to the evidence.

Appellants assert that the Bank had background information concerning Mash and refer to evidence (Tr. 728–730) which is as follows:

The senior vice president testified that at some time in 1969, prior to July 2, Mash applied for a loan to purchase some additional stock in the corporation; Stapp furnished his own personal financial statement; he, or he and Mash, proposed that Stapp would cosign the note, which never took place; the witness does not know what stock Mash owned nor the number of shares to be purchased; the witness believes it was represented to him that Stapp was attorney for the corporation and Mash was president; the witness had declined to make the loan without the endorsement of cosignature of Stapp; the witness had access to the file on the officers, directors, and stockholders of the corporation but does not recall who all of them were; the

witness would have been concerned with the ownership and management of the corporation in connection with the loan to purchase stock and informed himself in some degree with respect to who controlled the corporation; the witness does not recall that he knew that the Bank had a loan outstanding to Mash, which was a personal loan made at a branch by another officer, Stephenson, within his authority; he does not recall that he had authorized Stephenson to take that loan to an attorney to sue Mash on it, but he does recall that the bank had sued Mash on that loan at some time.

Appellants refer in brief to pages "T. 642–643" in support of the statement that prior to July 2, 1969, Stephenson had made the attachment affidavit mentioned above to effect that Mash was about to move out of the state. The affidavit appears on pages 690 and 691 of the transcript, which pages appear to have been numbered by the court reporter as pages "T–642" and "T–643." Pages of the transcript numbered 642 and 643 contain testimony of the respondent Hill. On Transcript page 643, Hill testifies as follows:

"A Robert (Stephenson) talked to me a few days later and told me that Mr. Little had informed him to take action and do whatever was necessary to secure the loan, and he took action on his Cadillac, his car." (Par. Supplied)

Appellants say that in addition to the matter last above mentioned, the Bank had knowledge that Mash was no longer an officer of the corporation and his name had been removed as an "authorized signatory" because Hembree testified that immediately following the meeting of May 5, 1969, he mailed to the Bank a letter advising that Mash's signature on the signature card had been removed, and there is no evidence that the Bank did not receive the letter. Appellants say further that Hembree presented to the Bank a copy of the resolution showing the persons authorized to draw checks on Air Movers' account and

the resolution did not include the name of Mash; that Weed, prior to issuing the checks, called the bookkeeping department and had both resolutions read to him.

Appellants refer to the testimony of Stapp (Tr. 565, 566) that, between May 5 and July 2, Stapp had told Stephenson of Mash's attempt to embezzle money of the corporation, and that Stapp discussed with Stephenson the resolution removing Mash as an authorized signer on Air Movers' bank account.

■ Stapp and others testified orally before the court as we understand this record. The rule is well established that the trier of facts has the responsibility of deciding which testimony heard ore tenus is correct and which inferences are to be drawn from such testimony. We are not persuaded that the trial court is plainly and palpably wrong in finding that the Bank was not notified of the dispute prior to issuing the cashier's checks.

### 3.

Appellants assert that the court erred in finding that the Bank was not at fault or involved in bringing on the controversy, and that the Bank did not wrongfully involve respondents in said controversy, in that said finding is not supported by the evidence.

Appellants contend that it was the negligence of the Bank in allowing withdrawal of the funds which created the controversy giving rise to the bill of interpleader.

We have already said that the evidence supports a finding that a dispute over control of Air Movers existed prior to July 2, 1969, and that the Bank was not notified of the dispute prior to issuing the cashier's checks.

Appellants argue that the Bank was at fault in issuing the checks because Weed, the officer issuing the checks, was negligent in that he had knowledge of facts that put him on notice that he should not issue

the checks without further inquiry as to the authority of Mash to sign checks on Air Movers' account.

The resolution of May 6, 1969, Exhibit 2 to the bill of interpleader, and the resolution of July 2, 1969, Exhibit 1 to the bill, are both on the same printed form. In pertinent part, Exhibit 2 recites in printed words as follows:

"FURTHER RESOLVED that all drafts and checks drawn against such account shall be signed by the following:

Immediately under the foregoing printed words are the following tyewritten words:

"TWO SIGNATURES REQUIRED:

"George F. Gaskin, President
Bill R. Hill, Vice-President
J. Frank Hembree, Secretary/Treasurer
Bill Roberson, Comptroller"

Exhibit 1 contains the same printed words quoted above. Beneath the printed words are typed the names of Mash, Webb, and Youngblood. The words "TWO SIGNATURES REQUIRED" do not appear. Exhibits 5 and 6 to the bill purport to be copies of the two checks presented to the Bank on July 2, 1969. Both checks, however, are signed by both Mash and Webb.

At the time on July 2, 1969, when the resolution, signature card, and checks signed by Mash and Webb were presented to Weed, he had no notice, and the trial court found that the Bank had no notice, of the dispute between the two groups claiming the right to control Air Movers. In the circumstances shown by the record, the issue as to whether or not the Bank did, through the negligence of its employee, Weed, wrongfully bring on the controversy, or wrongfully involve respondents in the controversy, presented a question of fact to be resolved by the court. We are of opinion that the court was not plainly and palpably wrong in finding that the Bank was not at fault.

4.

Appellants assigned for error that the trial court erred in finding as follows: that the Bank was a disinterested stakeholder; that there was only one liability of the Bank for the funds in Air Movers' account; and that the hazard of multiple liability to the Bank was caused by conflicting claims. The ground for said assignments is that the findings are contrary to the evidence. On the evidence in the record, the findings are not plainly and palpably wrong and the assignments are not sustained.

■ As noted above, one cashier's check for $50,000.00 was issued payable to Air Movers, the corporation on whose account the check presented to the Bank was drawn. By issuing a cashier's check to Air Movers, the Bank did not incur liability to any person or corporation other than the payee, Air Movers. The other cashier's check for $2,310.00 was payable to International Van Lines, Inc. The argument makes no distinction between the two checks.

In any event, both checks were delivered to the register on (Tr. 665) July 8, 1969, the day the bill of interpleader was filed. (Tr. 665, Complainant's Exhibit 3) At that time, no person could negotiate either check or impose on the Bank an obligation to pay the amount of the checks to any person or corporation other than the payee rightfully entitled to the same. The only liability of the Bank was to pay the checks to the person or persons rightfully entitled thereto as officers or agents of Air Movers. The controversy was between the two groups, each of whom claimed the right to represent or act for the corporation. There was only one liability on the Bank, to wit: to pay the checks to the rightful owners of Air Movers. The rightful owners were determined as between the two groups by their agreement dated April, 1970.

5.

■ Appellants assign as error that the trial court erred in its final decree in finding that the bill of complaint presents a proper case for interpleader and in ordering that a proper case for interpleader exists under Equity Rule 36, in that said finding and order are contrary to and are not supported by the evidence and the law.

Appellants say that the Bank, by its own wrongful act of negligence" . . . in paying out the funds of Air Movers of America, Inc. to Clyde Mash, brought on a controversy . . ." and now seeks to extricate itself from such controversy.

Appellants say further that, by so paying out such funds and by later refusing to honor a check presented by "officials of Air Movers," the Bank incurred an independent liability to Air Movers.

We do not agree. The Bank did issue a cashier's check payable to Air Movers, but the Bank never paid the check to Mash. The check was delivered to the register when the bill was filed. When respondents, on July 7, 1969, presented to the Bank a check on Air Movers' account, the Bank, and both groups, knew that a dispute existed between the two groups. The dispute was not settled until April, 1970, when the parties executed the agreement of that date. On July 7, 1969, neither the Bank nor anyone else could say with any degree of certainty which group was rightfully entitled to the money belonging to Air Movers. This appears to be a proper case for interpleader.

"Whenever any person has, or is alleged to have, any money or other property in his possession which is claimed by two or more persons, either he, or any of the persons claiming the same, may bring a bill of interpleader, or a bill in the nature of a bill of interpleader, in a court which has jurisdiction of the parties or of the money or property in

controversy . . ." Equity Rule 36, Code Recompiled 1956, Title 7, Appendix.

Appellants' contention is not sustained.

## 6.

Appellants assign for error that the court erred in awarding to complainant an attorney's fee in the amount of $7,500.00.

Appellants concede that Equity Rule 36 authorizes the trial court to order payment of a reasonable sum for attorney's fee where a proper case for interpleader exists, but respondents contend that no proper case for interpleader exists in the instant case and that the award of attorney's fee to complainant is error.

As already stated, we are of opinion that a proper case for interpleader here exists, and, as a consequence, we hold that award of attorney's fee to complainant was not error.

## 7.

Appellants assign as error that the trial court erred in ordering that complainant be discharged from any and all liability in both tort and contract to Air Movers, and in permanently enjoining Air Movers from further prosecuting Case No. 19407, the case filed by Air Movers against the Bank, Mash, Webb, and Thomas, on July 7, 1969.

This court has said:

"It, therefore, appears that since the original action must be on any 'contract for the payment of money,' the decision in the Pratt case should be construed as holding that where it is determined that a proper case for interpleader exists, the defendant 'is discharged from liability to the plaintiff' whether the complaint be on the common counts, or action for breach of contract or tort. . . ." Womack v. First National Bank of Guntersville, 269 Ala. 411, 417, 113 So.2d 194, 199.

Appellants say in brief:

"If the evidence in this case supports the finding of the court that a proper case of interpleader existed, then appellants agree that the court had authority to discharge appellee from all liability to the appellant, Air Movers of America, Inc. . . ."

Since we hold that a proper case for interpleader existed, we also hold that the court did not err in discharging the Bank from all liability.

## 8.

Appellants contend that the decree appealed from is in error because it is not supported by the evidence. We have already expressed the contrary opinion.

## 9.

Appellants assign as error the action of the court in overruling their demurrer to the bill. Appellants say that the averments of the bill show that complainant was not a mere innocent stakeholder, that complainant did have an interest in the subject matter of the suit, and that by its actions complainant had incurred an independent liability to Air Movers. These contentions of appellants have been considered hereinabove and we are of opinion that the contentions are without merit.

Appellants further assert that the bill failed to aver and was not accompanied by an affidavit to the effect that there was no collusion between complainant and any of the respondents, and that the failure to file such affidavit renders the bill subject to demurrer.

The bill is sworn to by an officer of complainant. Complainant does aver that it had at all times been ready and willing to pay the money in Air Movers' account to the proper person and is merely a stakeholder, but, there is no averment that there has been no collusion between the complainant and any respondent.

Ground 48 of appellants' demurrer recites:

"48. Complainant fails to aver that complainant is not in collusion with any of the respondents."

We have found only one Alabama case on this point. In an early case this court said:

"That the claimant of money or other thing may not be wrongfully delayed, the complainant in a bill of interpleader should make an affidavit, that his bill is not filed in collusion with either of the defendants named therein, but merely of his own accord to obtain the relief sought. [1 Smith's Prac. 474; Mitf. Plead. 49; 1 Cow,Rep. 704; 2 Story's Eq. 116; Story's Eq.Plead. 237.] The object of such an affidavit, it is said, is to prevent this proceeding from being resorted to for the purpose of giving an advantage to one claimant over the other; and if it is not annexed to the bill the want of 'it is in strictness a good ground of demurrer.' [Story's Eq. Plead. 238; 1 Cow.Rep. 704.] But if the defendants, without thus objecting that the complainant has not negatived collusion by his affidavit, submit to answer the bill, neither of them can at the hearing, or on error, object that it was irregularly exhibited. As the affidavit was intended for their benefit, and to prevent injury or inconvenience to the defendant who has the superior right, they may dispense with it, and their answers amount to an implied waiver. [See McElwaine v. Willis and others, 3 Paige's Rep. 505.]" Gibson v. Goldthwaite, 7 Ala. 281, 289.

It appears that the affidavit of noncollusion is not jurisdictional because it may be waived, but, in the case at bar, appellants did not waive the absence of the affidavit. According to Gibson v. Goldthwaite, supra, the court erred in overruling ground 48 of the demurrer.

What judgment then does the law require this court to render on this appeal?

The trial court found that complainant ". . . was not at fault or involved in bringing on said controversy regarding Air Movers and that the complainant did not wrongfully involve the respondents herein in said controversy . . ."; that ". . . complainant was at all times a disinterested stakeholder . . ."; and that the two cashier's checks were issued by the Bank "in good faith." We think that these findings are justified by the evidence.

The case was presented in detail and at length. The two volumes of the transcript contain more than eight hundred pages.

The decree was rendered prior to the adoption of the Alabama Rules of Civil Procedure. Rule 22 of those rules contains provisions with respect to procedure in interpleader cases. 290 Ala. 449. A comment on Rule 22 recites:

"The statutory requirement for verification, Code 1940, Tit. 7, § 1179 is ended by Rule 11." (290 Ala. 450)

Prior to submission on the merits, one opinion on this appeal was delivered August 30, 1973, and rehearing granted September 27, 1973.

After an examination of the entire cause as shown by the record, we conclude that nothing of substance would be accomplished nor any benefit accrue to appellants by a reversal requiring complainant to file an affidavit of noncollusion. From said examination of the record, it does not appear to us that the error complained of has probably injuriously affected substantial rights of the parties. Under Supreme Court Rule 45, a reversal should not be ordered for the error of overruling ground 48 of appellants' demurrer.

The Bank contends that, on affirmance, this court should add a ten per cent penalty on its attorney's fee under § 814,

Title 7, although no supersedeas bond has been made.

The Bank asks that under § 814, Title 7, this court, on affirmance, add a ten per cent penalty to its $7,500.00 attorney's fee. Appellee contends that even though no supersedeas bond was filed, the penalty is allowed under the 1951 amendment to § 814.

The penalty is allowed "When a judgment or decree is rendered for money, whether debt or damages . . ." In Fourth National Bank v. Woolfolk, 220 Ala. 344, 125 So. 217, it was held that § 814 does not apply to judgment against a claimant in interpleader who is not in possession and does not keep the money. Subsequently, in 1962, after the 1951 amendment, this court said:

"Appellee asks that the court reconsider its decision in Fourth Nat. Bank of Montgomery v. Woolfolk, 220 Ala. 344, 348–349, 125 So. 217, holding that the ten percent damages provided for in what is now § 814, Tit. 7, Code 1940, as amended by Act No. 724, appvd. Sept. 5, 1951, Acts 1951, p. 1275, does not apply when there is an affirmance of a judgment against a claimant in interpleader 'who is not in possession and who does not keep the money.' Under consideration in the Woolfolk case was § 6153, Code 1923, which was carried into the 1940 Code as § 814, Tit. 7. The 1951 amendment made no change in the provisions of § 6153 as carried into the 1940 Code. The Woolfolk case was decided in 1929 and the legislature has not seen fit to change the court's construction placed on the statute even though the provisions contained in § 6153 have been reenacted by the legislature twice, without change, since that decision. If the construction there placed on the statutory provisions is to be changed at this late date, it should be done by the legislature and not by this court." Cox v. Womack, 274 Ala. 1, 2, 3, 145 So.2d 201, 203.

It follows that the Bank's request here is due to be denied.

The Bank asks that this court award to it an additional attorney's fee for the appeal.

Equity Rule 36 provides that, in interpleader suits, the court "may" allow to one or more of the parties a reasonable sum for counsel fees payable out of the fund or property. This court has held that the chancellor is invested with a discretion in this regard. Chapman v. Rivers Construction Co., 284 Ala. 633, 644, 227 So.2d 403.

In the instant case, we have affirmed the action of the trial court allowing attorney's fee to complainant. We are not advised, however, of any statute or decisions of this court allowing additional attorney's fees on appeal in interpleader.

". . . In the absence of contract, statute, or recognized ground of equity, there is no inherent right to have attorneys' fees paid by opposing side. . . ." Johnson v. Gerald, 216 Ala. 581, 582, 113 So. 447, 448. See also: Bell v. Bell, 214 Ala. 573, 108 So. 375; Penney v. Pritchard & McCall, 255 Ala. 13, 49 So.2d 782; Low v. Low, 255 Ala. 536, 52 So.2d 218; Inland Mut. Ins. Co. v. Hightower, 274 Ala. 52, 145 So.2d 422; and Pappas v. City of Eufaula, 282 Ala. 242, 210 So.2d 802.

In the instant case, according to the averments of the bill of interpleader filed July 8, 1969, complainant paid into court "the sum of $910.80" and delivered the cashier's checks totaling $52,310.00. The $52,310.00 remained in the possession of complainant. Appellants, on May 14, 1970, filed motion to dismiss the bill or to order complainant to deposit the money with the register and to order the register to deposit the money at interest. On May 25, 1970, the court ordered complainant to pay the money to the register and complainant did so. During the ten months between the filing of the bill and payment of the money

to the register, complainant enjoyed the use and benefit of fifty thousand dollars which belonged to the respondents. At the rate of six per cent per annum, the complainant would have realized $2,500.00 in interest. The motion for additional attorney's fee is denied.

On the basis of what has been written, the decree appealed from is due to be affirmed.

Affirmed.

HEFLIN, C. J., and MERRILL, HARWOOD, MADDOX, McCALL and FAULKNER, JJ., concur.